UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CAMERON D'AMBROSIO,
     Plaintiff,


     v.                               CIVIL ACTION NO. 16-10534-MPK[1]

CITY OF METHUEN, MASSACHUSETTS,
MICHEL J. EWING, JAMES A. MELLOR,
JOHN WALSH, CHIEF JOSEPH A. SOLOMON, and
JANE DOE,
     Defendants.


MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#65) AND
PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT (#67).

KELLEY, U.S.M.J.

    I.    <u>Introduction</u>.

       This case began when Cameron D'Ambrosio, a student at Methuen High School who had

been the victim of bullying, published what he said were rap lyrics on Facebook, in which he

arguably threatened to kill unnamed persons who had bullied him at the high school. As a result,

he was arrested by Methuen police and charged with violating Mass. Gen. Laws c. 269, § 14(b),

which, among other things, makes it a crime to threaten to use or have present a bomb or other

weapon at a certain location. After D'Ambrosio was arrested, and a criminal complaint issued in

the Lawrence District Court, a dangerousness hearing was held pursuant to Mass. Gen. Laws c.

276, § 58A. A district court judge found D'Ambrosio to be dangerous and ordered him held

---

[1] With the parties' consent, this case was reassigned to the undersigned for all purposes,
including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#23.)

without bail. Eventually, a grand jury returned a no bill against D'Ambrosio, and he was released, having spent thirty-seven days in custody. Soon after, the criminal complaint against him was nolle prossed by the Commonwealth.

D'Ambrosio sues five Methuen police officers in their individual capacities, and two of them (Chief Joseph Solomon and Sergeant Walsh) also in their supervisory capacities, for civil rights violations and torts. Regarding Officer Jane Doe, D'Ambrosio has had plenty of time to identify her and has never done so, and therefore the allegations against her are dismissed. *See Figueroa v. Rivera*, 147 F.3d 77, 82-83 (1st Cir. 1998) (holding that after seventeen months, dismissal was proper as to defendant who had never been identified and served).[2]

As explained below, the court finds that the officers had probable cause to arrest D'Ambrosio for violating c. 269, § 14, and further finds that that even if they did not have probable cause, they are entitled to qualified immunity. Therefore, the claims against the officers for violating D'Ambrosio's Fourth Amendment rights are dismissed. The court finds that the officers also are entitled to qualified immunity for any claim based on D'Ambrosio's First Amendment rights. Finally, for the reasons set out below, none of the state law claims has merit. Therefore, defendants' motion for summary judgment is allowed, and plaintiff's cross-motion is denied.

II.     Plaintiff's Claims.

In Count I of the complaint, D'Ambrosio claims that the police officers violated 42 U.S.C. § 1983 by: detaining and frisking him without reasonable suspicion; arresting him without an arrest warrant and without probable cause; falsely and maliciously accusing him of

---

[2] D'Ambrosio previously filed a stipulation of dismissal of Count V of the complaint against the City of Methuen. (#79.)

violating c. 269, § 14 and prosecuting him for that crime; interfering with his First Amendment right to freedom of speech; submitting a baseless application for a criminal complaint and signing a baseless criminal complaint; seeking an unreasonable bail amount; making false statements to the press; failing to conduct a proper investigation; wrongly obtaining a search warrant for his home; violating his privacy; wrongly executing the search warrant and seizing property from his home; and maliciously prosecuting him. (#1 at 15-17.)

In Count II, he alleges that the officers committed common law conspiracy to violate his civil rights in violation of 42 U.S.C. § 1983, with the same wrongful actions alleged as in Count I. *Id.* at 18-20.

In Count III, he alleges that the officers violated Mass. Gen. Laws c. 12, §§ 11H and 11I (the Massachusetts Civil Rights Act, or MCRA), repeating the factual allegations from Count I. *Id.* at 20-21. In Count IV, he alleges that the officers committed common law conspiracy to violate his civil rights under the MCRA. *Id.* at 21-23.

He also makes claims of false imprisonment (Count VI), false arrest (Count VII), malicious prosecution (Count VIII), and intentional infliction of emotional distress (Count IX). *Id.* at 24-27.

Defendants move for summary judgment, asserting the officers are entitled to qualified immunity because a reasonable police officer would have believed probable cause supported D'Ambrosio's arrest. (#71 at 10.)  D'Ambrosio opposes, asserting his arrest was not supported by probable cause, and defendants are not entitled to qualified immunity. (#73.) He also moves for partial summary judgment on the § 1983 claims arising under the First and Fourth Amendments set out in Counts I and II, and his false arrest claim set out in Count VII, asserting

that as his arrest was not supported by probable cause, he prevails on those counts as a matter of law. (#67.)

The court held an oral argument on the cross-motions on March 8, 2019. (#81.) Plaintiff filed a supplemental memorandum after the hearing. (#83.)

III.    <u>Statement of Facts</u>.

The following narrative is taken from D'Ambrosio's statement of material facts (#69), defendants' statement of material facts (#71), D'Ambrosio's response to defendants' statement (#75), and the exhibits attached to those filings. Both parties attached partial transcripts of certain witnesses' depositions to their filings, which are fragmented. The court requested complete transcripts of the depositions of D'Ambrosio, Sergeant Walsh, and Sergeant Ewing, which are on the docket at ##84-86,[3] and the court also considers the testimony in those depositions. The facts are undisputed unless noted.

A.    <u>D'Ambrosio Posts to Facebook</u>.

D'Ambrosio was a victim of bullying from the third grade through high school. (#71-1 at 8-9.) In September 2012, during the first week of his senior year at Methuen High School (MHS), he was severely beaten by another student, which he described as "[being beaten] pretty badly, lacerated spleen, so [as a result he] was seeking counseling from the bullying and PTSD." *Id*. at 10. At his deposition, he described how, after the incident in which he was beaten, he "couldn't walk through the hallways [of MHS] without someone saying, "oh, there's Cam, the little bitch who got jumped, who got beat up and hospitalized and everyone saw you …." *Id*. at 4.

_____

[3] D'Ambrosio's complete deposition transcript is filed under seal because it contains personal information about him. (#84.) The court cites the excerpts from his deposition that are attached to the parties' filings when possible, and only cites the transcript filed under seal when necessary.

On the morning of May 1, 2013, D'Ambrosio took the school bus to MHS. (#70-1 at 3; #84 at 31-32.) Rather than attending school, however, he walked to the Nevins Memorial Library, a nearby public library in Methuen. (#84 at 31.) He went to the library instead of going to his classes because he "didn't want to deal with the bullying and stuff" at school. *Id.* at 32.

D'Ambrosio often listened to rap music, and he wrote and performed his own rap lyrics. (#70-2 at 1-2.) At the library on the morning of May 1, D'Ambrosio was listening to rap music, and was inspired by a Biggie Smalls song in which the artist uses the phrase "Blow up like the World Trade," which D'Ambrosio understood to be a reference to the "first time they tried to blow [the World Trade Center] up." (#70-1 at 8-9.) He testified at his deposition that because "the Boston Marathon [bombing] just happened,"[4] he decided to "make a metaphor, let people know how I'm feeling, see how they feel about this …." *Id.*

Using a library computer, he published the following post on his Facebook page to his approximately 490 Facebook friends:

> All you haters keep my fuckin' name outcha mouths, got it?  What the fuck do I gotta do to get some props and shit huh?  Ya'll wanme to fucking kill somebody? What the fuck do these fucking demons want from me?  Fucking bastards I aint no longer a person, I'm not in reality, So when u see me fucking go insane and make the news, the paper and the fucking federal house of horror known as the white house, Don't fucking cry or be worried because all YOU people fucking caused this shit.  fuck a boston bominb wait till u see the shit I do, I'ma be famous for rapping and beat every murder charge that comes across me!

(#70-3) (syntax and spelling as in original).

---

[4] The Boston Marathon bombing occurred on April 15, 2013, approximately two weeks before D'Ambrosio posted his message on Facebook.

At his deposition, when questioned about what the post meant, D'Ambrosio stated that he was addressing the students at MHS who had bullied him. (#71-1 at 6.) "I felt like all these people that were triggering me and pushing me were just bastards, just fatherless lowlifes who had nothing better to do than to pick on the weak, pick on me …." *Id.* "I didn't feel like I was a person. I didn't feel like I belonged with anybody. Went to school, walked through the hallways, felt like a ghost." *Id.* When asked what the reference to demons meant, he said, "... I felt like I had a lot of personal demons, and … I just felt like the demons just wanted me – you know, to lash out, to cease to exist, to go and do something stupid, like kill myself or try to hurt someone which I would never do because I've been hurt my whole life by others …. And I was kind of just screaming out for help." (#84 at 48.)

B. <u>The Post is Reported to Officer Mellor at MHS</u>.

Around 12:45 p.m. the day that D'Ambrosio posted the message to Facebook, a student approached James Weymouth, the athletic director and an associate principal at MHS, because she had seen the post and was nervous about it. (#70-4 at 2, 7.) Weymouth said at his deposition that he asked the student to accompany him to an office so he could see the post on a computer screen. *Id.* at 3. After reading the post, Weymouth contacted Officer Mellor of the Methuen police, who worked as the school resource officer for MHS. (##70-5 at 2-3; 71-4 at 3.)[5] Officer

---

[5] Weymouth wrote a report dated May 1, 2013, that documents his response to the post. (#71-3 at 2.) He states that after being alerted by the student that there was a "very disturbing post on Facebook," he read it, and immediately showed it to Officer Mellor and another associate principal. *Id.* Next, he reported the incident to the principal of the school, who then reported it to the superintendent of schools. *Id.* After looking up D'Ambrosio's class schedule and trying to ascertain whether D'Ambrosio was in the building or had been in his classes that day, he consulted with D'Ambrosio's father, and then decided to try to intercept D'Ambrosio at his bus. *Id.* Finally, he reported that he and three other associate principals were approached by approximately thirty students reporting D'Ambrosio's post. *Id.*

Mellor also spoke to the student who reported the post, and she told him that the post had "made her uneasy and made her frightened," because D'Ambrosio usually sat next to her in a class. (#70-5 at 6-7.)

At his deposition, Officer Mellor recalled reading the post and then asking for it to be printed out, "because [he was] going to need it to be printed so [he] could show it to my – to my boss." (#70-5 at 5.) He next called his supervisor, Sergeant Walsh, and said, "Sergeant, I have a possible threat." *Id*. at 8. He told Sergeant Walsh that it was an emergency, and he should come to the school right away. *Id*.

Officer Mellor stated that he and the school administrators considered the threat to be against "the kids at the school," or "the people at Methuen High." (#71-4 at 12-13.) When asked if he thought the threat was to the "physical building," he stated, "The people in it. The people. The building. The presence of. Everybody. All inclusive." *Id*. at 32. At his deposition, when pressed about why he thought the "haters" to which the post was addressed were students at the school, Officer Mellor said he thought "[a]pparently the young lady that reported it is one of the haters," because she was "concerned" by the post. *Id*. at 29-30. He added, "You know, this is the sort of thing that's making us nervous at school." *Id*. When asked why he considered the post to be a threat, he explained that the reference to the Boston Marathon bombing was especially alarming: "… [A]s a whole, when you're making reference to a massacre that happened two weeks earlier than this … and that many people died, over the news all day long, that I'm going to outdo what they do[sic] made people extremely nervous which we took as a threat." *Id.* at 31.

Officer Mellor met Sergeant Walsh at the door of the school. (#70-5 at 10.) Sergeant Walsh read the post, and then asked Office Mellor where D'Ambrosio was. *Id*. Officer Mellor replied that "Mr. Weymouth was looking for him" and that D'Ambrosio might have left the

school. *Id*. Officer Mellor said that Sergeant Walsh told him, "Go back in … [g]o check. See if they found [D'Ambrosio]. Let me get back to you in a couple – in a few minutes." *Id*. at 11. At his deposition, Officer Mellor said that he was under the impression that Sergeant Walsh was "trying to process it himself and determine how we were going to proceed." *Id*. at 11.

    C.  <u>Sergeant Walsh Confers with Sergeant Ewing, Who Calls a Prosecutor</u>.

Sergeant Walsh called his supervisor, Lieutenant Kevin Mahoney, and read the post to him over the phone. (#70-6 at 6.) At Mahoney's instruction, Sergeant Walsh contacted the court liaison officer, Sergeant Michael Ewing, and reported the Facebook post, and asked him "what he thought we might have for charges." *Id*. at 8.

At their depositions, Sergeants Walsh and Ewing disagreed about what they discussed over the phone. Sergeant Walsh recalls he read Sergeant Ewing the post word-for-word; Sergeant Ewing believes Sergeant Walsh summarized the content of the post. (#70-6 at 14 (Walsh); #70-7 at 2, 9 (Ewing).) Sergeant Walsh believes they discussed c. 269, § 14; Sergeant Ewing does not recall discussing any specific statute. (#70-6 at 9 (Walsh); #70-7 at 6 (Ewing).) Sergeant Walsh stated at his deposition that Sergeant Ewing said "he'd call me back, he was going to run it by a DA." (#70-6 at 9.)

Sergeant Ewing testified at his deposition that immediately after speaking with Sergeant Walsh, Sergeant Ewing called an assistant district attorney (ADA), to whom he spoke for "a couple of minutes." (#70-7 at 3-4.) He did not remember the name of the ADA. *Id*. at 5. During the call, Sergeant Ewing "summed [the post] up in roughly two or three lines." *Id*. at 7. The ADA responded, "[I]t sounds like it's the threats. If you guys see [D'Ambrosio], you should grab him." *Id*. Although Sergeant Ewing does not recall if the ADA identified a particular statute, he recalls discussing with the ADA that the crime was a felony. *Id*. at 7-9.

Sergeant Walsh stated that he was driving and was going to help Officer Mellor look for D'Ambrosio, when Sergeant Ewing called him back and said "something along the lines that [Sergeant Ewing had] spoke[n] with an ADA, and that 269, 14, would be a good charge." (#70-6 at 11.) Sergeant Walsh made the determination to charge D'Ambrosio with that crime based on what the ADA said, "combined with the facts up to that point." *Id*. at 11-12. He was not sure if he had looked at the statute at that time. *Id*. at 12.

D. D'Ambrosio is Arrested and Charged.

Around 1:00 p.m., (only about fifteen minutes after the post had first been reported to Office Mellor), Sergeant Walsh met again with Officer Mellor. (#70-5 at 12.) Officer Mellor testified at his deposition that "Sergeant advised me that what – the way he wanted to proceed was that he had either written down or possibly a law – you know, a reference book out, and gave me the chapter and section two six – whatever the chapter and section is that we charged him with." *Id*. at 13. Officer Mellor recalled Sergeant Walsh saying, "This is what we're going to go forward with. We're going to charge him with this. It's a felony. It's an arrestable offense." *Id*. When, at his deposition, Officer Mellor was asked if he had "any concern" about charging D'Ambrosio under that statute, Officer Mellor replied, "[N]o sir. I was told that by my superior officer [sic] that's what we would be proceeding with, and I said okay." *Id*. at 14. Officer Mellor summed up what he recalled Sergeant Walsh saying to him: "He said, What we have, meaning the Facebook post, would violate this statute. Let's proceed with it. That's what I want you to do." *Id*. at 14-15.

Sergeant Walsh instructed Office Mellor that if he could not find D'Ambrosio, he should go to the police station and begin the paperwork for an arrest warrant. *Id*. at 13-14. After failing to find D'Ambrosio, Officer Mellor left the high school. *Id*. at 18.

Around 1:30 p.m., Officer Mellor was driving and spotted D'Ambrosio walking toward MHS. *Id*. at 18-19. He was on the phone with Sergeant Walsh, who told Officer Mellor to stop D'Ambrosio. *Id*. at 20. Officer Mellor stopped his car, and waved D'Ambrosio over to him. *Id*. He told him, "Cam, I think we have a problem with a Facebook post." *Id*. at 23. He searched D'Ambrosio's backpack. *Id*. at 25-26. The backpack only contained "miscellaneous school stuff." *Id*. at 23. D'Ambrosio asserts that as he was being arrested, he told Officer Mellor the post was only rap lyrics (#84 at 61); Officer Mellor denies this (#70-4 at 25).

Sergeant Walsh arrived after Officer Mellor had stopped D'Ambrosio, and told D'Ambrosio he was under arrest. (#70-5 at 22.) Officer Mellor handcuffed D'Ambrosio, and D'Ambrosio was taken to the Methuen Police Department, where he was booked and given *Miranda* warnings. *Id*. at 23, 28-29. He confirmed he made the post. *Id*. at 29.

Officer Mellor prepared the police report and an application for a criminal complaint. (##70-5 at 30; 71-7 at 2.) He testified at his deposition that before he wrote the police report he looked at c. 269, § 14 and consulted with Sergeant Walsh about the statute. *Id*. at 37. Officer Mellor signed the application for a criminal complaint, which simply charged a violation of "269-14" and not any specific subsection. (#71-7 at 2.) He said that it was his "intention or [his] thought was it was just 14, which would encompass anything or all under there." (#71-4 at 28.) The crime is listed on the complaint application as "bomb scare, communicating." (#71-7 at 2.)

Officer Mellor also signed the affidavit for the search warrant for D'Ambrosio's house. (#70-5 at 38.) A detective wrote the affidavit; the first part of it simply repeated Officer Mellor's police report. *Id*. at 42. In summary, the affidavit repeats the post verbatim, states that after being read his *Miranda* rights, D'Ambrosio admitted that he wrote the post, and concludes that there is

probable cause to believe that evidence of a violation of c. 269, § 14 will be found at D'Ambrosio's house. (#70-14 at 1-3, warrant affidavit.)

The search warrant was executed the same day as D'Ambrosio's arrest, and no weapons or devices capable of causing physical harm were recovered from the home. (#69 at 11.) The police seized an Xbox gaming console and a Dell computer from the home. *Id*. Nothing incriminating was found on the electronic devices. (#71-4 at 28.)

MHS was not evacuated in response to D'Ambrosio's post, nor did Officer Mellor ever recommend that the school be evacuated. (#69 at 8.) No search for explosive devices was conducted at the school. *Id*.

Officer Mellor gave the application for complaint to Sergeant Ewing, who brought the paperwork to the Lawrence District Court and signed the complaint. (#70-7 at 17, 19.) On May 2, 2018, the clerk's office issued a criminal complaint. (#69 at 12.) The complaint lists c. 269, § 14(b) as the offense. (#70-16, complaint.)

D'Ambrosio appeared in court on May 2, 2013. (#70-17, docket sheet.) An attorney was appointed to represent him, and he was held without bail pursuant to Mass. Gen. Laws c. 276, § 58A.[6] On May 9, he had a dangerousness hearing under § 58A before District Court Judge Lynn Rooney, who found him to be dangerous and held him without bail. *Id*.

---

[6] The court notes that under this statute:

> When a person is held under arrest for an offense listed in subsection (1) and upon a motion by the commonwealth, the judge shall hold a hearing to determine whether conditions of release will reasonably assure the safety of any other person or the community.
> The hearing shall be held immediately upon the person's first appearance before the court unless that person, or the attorney for the commonwealth, seeks a continuance. Except for good cause, a continuance on motion of the person may not exceed seven days, and a continuance on motion of the attorney for the commonwealth may not exceed three business days. ***During a continuance, the***

D'Ambrosio was held without bail for thirty-seven days. (#69 at 12.) Approximately three weeks after his release and the grand jury issued a no bill, the Essex County District Attorney's Office issued a nolle prosequi. *Id.*

IV.   Summary Judgment Standard.

When considering a motion for summary judgment, "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of averring the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). Once the moving party asserts the absence of genuine issues of material fact, the non-movant must demonstrate the existence of a factual dispute with requisite sufficiency to proceed to trial. *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006).

In determining whether summary judgment is proper, the record must be viewed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in the non-movant's favor. *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 56 (1st Cir. 2018).

V.   The Police had Probable Cause to Arrest D'Ambrosio.

Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of "any rights, privileged, or immunities secured by the Constitution and

---

*individual shall be detained upon a showing that there existed probable cause to arrest the person.*

Mass. Gen. Laws c. 276, § 58A(4) (emphasis added). Thus, on the facts of this case, on May 2, 2018, a district court judge would have to have found that probable cause existed to arrest D'Ambrosio in order to hold him during the continuance until the dangerousness hearing on May 9, 2018.

[federal] laws." 42 U.S.C. § 1983. To prove a claim under § 1983, "the plaintiff must show a deprivation of a federally secured right." *Harrington v. City of Nashua*, 610 F.3d 24, 28 (1st Cir. 2010). If D'Ambrosio was arrested without probable cause, then his rights under the Fourth Amendment were violated. *Dist. of Columbia v. Wesby,* -- U.S. --, 138 S. Ct. 577, 585-86 (2018) (citing *Payton v. New York,* 445 U.S. 575, 585 (1980)); *Cox v. Hainey*, 391 F.3d 25, 30 (1st Cir., 2004).

Probable cause exists where "the arresting officer, acting on apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee is likely one of the perpetrators." *Wilson v. City of Boston,* 421 F.3d 45, 54 (1st Cir. 2005) (citing *Acosta v. Ames Dep't Stores, Inc.,* 386 F.3d 5, 9 (1st Cir. 2004)). To determine whether an officer had probable cause, the court must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Wesby,* 138 S. Ct. at 585-86 (citing *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)) (further internal citations and quotation marks omitted). Probable cause is evaluated as of the moment the arrest was made. *Beck v. Ohio,* 379 U.S. 89, 91 (1964). Although the exact degree of certainty required to establish probable cause is difficult to quantify, it falls between mere suspicion and what would be necessary to convict. *Burke v. Town of Walpole,* 405 F.3d 66, 80 (1st Cir. 2005) (internal citation omitted). The First Circuit, discussing the difficulty of applying this standard, has stated that "centrally, the mercurial phrase 'probable cause' means a reasonable likelihood." *Valente v. Wallace*, 332 F.3d 30, 32 (1st Cir. 2003) (citing *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).

D'Ambrosio was arrested because the police understood that his Facebook post violated c. 269, § 14. That statute provides, in relevant part:

(b) Whoever willfully communicates or causes to be communicated, either directly or indirectly, orally, in writing, by mail, by use of a telephone or telecommunication device, including, but not limited to, electronic mail, Internet communications and facsimile communications, through an electronic communication device or by any other means, a threat:—

> (1) that a firearm, rifle, shotgun, machine gun or assault weapon . . . an explosive or incendiary device, a dangerous chemical or biological agent, a poison, a harmful radioactive substance or any other device, substance or item capable of causing death, serious bodily injury or substantial property damage, will be used at a place or location, or is present or will be present at a place or location, whether or not the same is in fact used or present;

> (2) to hijack an aircraft, ship, or common carrier thereby causing anxiety, unrest, fear, or personal discomfort to any person or group of persons shall be punished by imprisonment in the state prison for not more than 20 years or imprisonment in the house of correction for not more than 2 ½ years, or by fine of not more than $10,000, or by both such fine and imprisonment.

(c) Whoever willfully communicates or causes to be communicated such a threat thereby causing either the evacuation or serious disruption of a school, school related event, school transportation, or a dwelling, building, place of assembly, facility or public transport, or an aircraft, ship or common carrier, or willfully communicates or causes serious public inconvenience or alarm, shall be punished by imprisonment in the state prison for not less than 3 years nor more than 20 years or imprisonment in the house of correction for not less than 6 months nor more than 2 ½ years, or by fine of not less than $1,000 nor more than $50,000, or by both such fine and imprisonment.

. .

(e) Nothing in this section shall authorize the criminal prosecution of picketing, public demonstrations or other similar forms of expressing views.

Mass. Gen. Laws c. 269, § 14(b), (c), (e).

D'Ambrosio argues that there was not probable cause to arrest him because c. 269, §

14(b) requires that one threaten to have a specified weapon at a certain location, and the post did

not contain this precise information. *See, e.g.*, #74 at 1. The question whether the police had probable cause to arrest D'Ambrosio, however, is not that simple. While the post did not explicitly target a specific place, nor did it plainly reference any of the dangerous devices enumerated in the statute, the question remains whether the police properly could infer from the post that D'Ambrosio was threatening to use some unspecified destructive device to commit murder, and whether the police properly could infer that he was threatening to use the device at the high school.

D'Ambrosio's Facebook post addressed "All you haters," which a reasonable police officer could well have thought were students at the high school.[7] He asked – "Y'll wanme to fucking kill somebody?" (#70-3.) He went on to say, "[W]hen u see me fucking go insane and make the news, the paper and the fucking federal house of horror known as the white house, Don't fucking cry or be worried because all YOU people fucking caused this shit. fuck a boston bominb wait till u see the shit I do, I'ma be famous for rapping and beat every murder charge

---

[7] At oral argument, plaintiff argued that there was nothing in the record to establish that the police knew that D'Ambrosio had been victimized by other students, a fact which supported the inference that D'Ambrosio was threatening the school. First, for purposes of summary judgment, plaintiff admitted that he had been bullied since the third grade, that he could not walk the halls of the high school without being targeted, and that he was severely beaten months prior to the Facebook posting. (#75 at 1.) Second, even taking the facts in the light most favorable to D'Ambrosio, one still may infer that since the alarm was raised at the high school by first, one frightened student, to whom Officer Mellor spoke directly, and then many other students, and since several school administrators were involved in responding to the post, the police had some knowledge about D'Ambrosio's history. Even if one does not draw this inference, however, Officer Mellor still testified at his deposition that he thought the post was a threat to the high school building, and the people in it. (#71-4 at 12-13, 29-32.) Further, Officer Mellor's belief that D'Ambrosio was addressing students at the high school was in fact correct, as D'Ambrosio testified to that at his deposition. (#71-1 at 4-6.) Finally, although it is a fine point, when Officer Mellor was driving and spotted D'Ambrosio walking down the street, it is apparent from his deposition testimony that Officer Mellor recognized him, and he testified that he called out to him using a shortened version of his name, "Cam," suggesting that he knew him. (#70-5 at 19.)

that comes across me!" *Id*. A reasonable police officer could have read this to mean that D'Ambrosio was threatening to commit murder, on a scale worse than the Boston Marathon bombing (in which three people were killed and several hundred were injured), with a weapon, whatever it might be, that was capable of that kind of destruction. The officer could also reasonably have inferred that the attack would take place at the high school, since the post appeared to be directed toward those who had bullied D'Ambrosio, and they were his fellow students. Viewing these facts from the vantage point of a reasonable officer, the determination that D'Ambrosio had violated the statute was not a "mere suspicion," but was reasonably likely. *Valente*, 332 F.3d at 32. The police had probable cause to arrest him.

The court will go on to analyze this case under the law of qualified immunity, because even if one assumes arguendo that the police did not have probable cause, the court concludes that the officers still should be protected from suit.

VI.     The Law of Qualified Immunity.

Qualified immunity protects an officer from civil liability "when a reasonable decision in the line of duty ends up being a bad guess." *Belsito Comm'ns, Inc. v. Decker,* 845 F.3d 13, 22 (1st Cir. 2016) (citing *Taylor v. Barkes,* -- U.S. --, 135 S. Ct. 2042, 2044 (2015) (further internal citations omitted)); *see also Rivera-Corraliza v. Morales,* 794 F.3d 208, 215 (1st Cir. 2015) ("Courts penalize officers for violating bright lines, not for making bad guesses in grey areas."). It protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Claims of qualified immunity are viewed

"through the lens of objective reasonableness." *Conlogue v. Hamilton,* 906 F.3d 150, 154 (1st Cir. 2018). "So viewed, only those officials who should have known that their conduct was objectively unreasonable are beyond the shield of qualified immunity and, thus, are vulnerable to the sword of liability." *Id.*; *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

The Supreme Court has established a two-part inquiry in determining whether a government official is entitled to qualified immunity. *Pearson,* 555 U.S. at 232 (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). To avoid summary judgment based on a qualified immunity defense, D'Ambrosio must show that: (a) defendants violated his constitutional rights; and (b) "these rights were so clearly established that a reasonable officer should have known how they applied to the situation at hand." *Belsito*, 845 F.3d at 23 (citing *City & Cnty. of S.F. v. Sheehan, -- U.S. --,* 135 S. Ct. 1765, 1774 (2015); *Pearson,* 555 U.S. at 232; *Cortes-Reyes v. Salas-Quintana,* 608 F.3d 41, 51-52 (1st Cir. 2010)). The court may analyze the qualified-immunity steps in any order. *Belsito*, 845 F.3d at 23.

When an officer consults with a prosecutor about "the legality of an intended action," the officer's "reliance on emergent advice" may be relevant to the officer's later conduct and may help to establish qualified immunity. *Belsito,* 845 F.3d at 24. The First Circuit has admonished, however, that "a wave of the prosecutor's wand cannot magically transform an unreasonable probable cause determination into a reasonable one," and in order to rely on a prosecutor's advice, the officer must have made a "full presentation of the known facts." *Cox,* 391 F.3d at 34-35. Further, the officer's reliance on the advice must be "objectively reasonable." *Id.* at 35. An officer's reliance on a prosecutor's advice will not factor favorably into the qualified immunity analysis when "an objectively reasonable officer would have cause to believe that the prosecutor's advice was flawed, off point, or otherwise untrustworthy." *Id.*

VII.    Qualified Immunity Analysis - D'Ambrosio's Arrest.

A.  D'Ambrosio's Fourth Amendment Rights.

To analyze this matter, the court goes directly to the "clearly-established" step, which requires D'Ambrosio to identify "controlling authority" or a "robust consensus of cases of persuasive authority" that forbade the police from acting as they did. *Belsito,* 845 F.3d at 23.

B.  Was the Fourth Amendment Right Clearly Established?

In determining whether a right was clearly established, the court asks two questions: (a) whether there was "controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm"; and (b) whether "an objectively reasonable officer would have known that his conduct violated the law." *Conlogue,* 906 F.3d at 155 (citing *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 1131 (2018)).

D'Ambrosio was arrested in May 2013. Six years before, the Supreme Judicial Court of Massachusetts (SJC) discussed the elements of c. 269, § 14 in *Commonwealth v. Kerns,* 871 N.E. 2d 433 (Mass. 2007). Citing the statute's "unambiguous language," the SJC held that § 14(b) requires the Commonwealth to prove "(1) that the defendant willfully communicated, or caused to be communicated, a threat (2) to use or have present (3) one of an enumerated list of dangerous devices, substances, or items capable of causing death, serious bodily injury, or substantial property damage (4) at a place or location." *Id.* at 441. Observing that the statute was enacted just after the September 11, 2001 attacks, the SJC "conclude[d] that the Legislature intended to punish the communication of any threat that a deadly, dangerous, or destructive device, substance, or item is or will be present or used at a specific place or location." *Id.* "Read

straightforwardly, the statute protects any 'place or location' from threats that deadly, dangerous, or destructive weapons will be present or used, regardless of an actual ability or intention to carry out the threat." *Id.* The court found there is no requirement that the threat be communicated to any potential target. *Id.* at 441-42. In short, § 14(b) "protects places or locations, and ultimately, the public." *Id.* at 443.

Notwithstanding the SJC's explication of the elements of § 14(b) in *Kerns*, between 2007 and the date of D'Ambrosio's arrest in 2013, there were few reported cases concerning the statute, and none exploring the nuances of its application. However, even though they were issued after D'Ambrosio's arrest, two orders by Superior Court Judge Janet Kenton-Walker shed light on problems that arise in applying the SJC's pronouncements in *Kern* to particular facts.

In *Commonwealth v. Forts,* 2015 WL 6956784 (Nov. 6, 2015), Judge Kenton-Walker considered whether an indictment should be dismissed against a high school student who was charged under § 14 with making a bomb threat, where he caused his high school to be evacuated by leaving messages around the school that suggested that the school would be bombed and, in one missive, wrote: "Founders Hall – evacuate at 2:33 p.m." *Id.* at *2.

In response to defendant's argument that he did not name a specific weapon in his threats, Judge Kenton-Walker noted that the statute criminalizes a threat that is made "directly or indirectly," so that even if a threat is not specific, "indictment is still proper if a grand jury determines that the recipient of the threat could reasonably infer that the defendant intended to use or have present one of the listed weapons." *Id*. at *4. She also pointed to the "catch-all" phrase in the statute: "any other device, substance, or item capable of causing death, serious bodily injury or substantial property damage." *Id*. She concluded: "A threat under § 14, therefore, need not contain a specific reference to guns, bombs, chemicals, biological agents, or

any other weapon, so long as the recipient of the threat reasonably understands that the individual making the threat intends to use or make present some 'device, substance or item' capable of inflicting serious harm, death, or serious property damage." *Id*. Judge Kenton-Walker thus held that while the defendant had not made an explicit reference to any device in his communications, the indictment should not be dismissed, because one could infer from the threats communicated that defendant intended to commit "mass murder," or at least damage the school building, using "a device, substance or item" capable of causing serious harm or death. *Id*. at *5.

In *Commonwealth v. Grenga*, 2015 WL 6956766 (Nov. 6, 2015), Judge Kenton-Walker again ruled on a motion to dismiss an indictment for violation of § 14, where a high school student had asked a teacher what she would do if he showed up to school wearing a bomb vest, and then later drew a picture of himself wearing one, with the word "soon" under the picture. *Id*. at *1. The court found that the evidence presented to the grand jury was sufficient to indict him for making a bomb threat, because the drawing, considered in light of his prior question to his teacher, was a communication of his intent to come to the school wearing a bomb vest. *Id*. at *3.

"Public officials … need not be legal savants to win a qualified immunity case." *Belsito,* 845 F.3d at 23 (citing *Crawford-El v. Britton,* 523 U.S. 574, 590 (1998)). If the relevant "legal principles are clearly established at only a level of generality so high that officials cannot fairly anticipate the legal consequences of specific actions, then the requisite notice is lacking." *Savard v. Rhode Island*, 338 F.3d 23, 28 (1st Cir. 2003) (en banc) (holding that "relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law"). Although a legal principle can be "clearly established" without factually identical precedent, "the

existing case law must have placed the constitutional … question 'beyond debate.' " *Pagan-Gonzalez v. Moreno*, -- F.3d --, 2019 WL 1306382 (1st Cir. Mar. 22, 2019) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

At the time of D'Ambrosio's arrest in 2013 there did not exist "controlling authority" sufficient to put the officers here on notice that their conduct fell short of the constitutional norm. *Conlogue,* 906 F.3d at 155. One might argue, as plaintiff does, that *Kerns* held that in order to violate § 14, D'Ambrosio's post must have constituted a threat that a certain device would be present at a certain place. However, neither *Kerns* nor any other Massachusetts case between 2007 and 2013 provides guidance concerning the situation, such as the one here, where a threat to use a device at a certain location may be *inferred* from a communication. Although the orders by Judge Kenton-Walker, discussed above, were issued after D'Ambrosio's arrest, her application of the law to specific facts demonstrates that the case law at the time of D'Ambrosio's arrest did not constitute "a consensus of persuasive authority" to guide the officers' actions in this matter. *Id.* For example, she held that a threat can violate the statute even though it does not name a specific weapon, as long as one can infer that the harm threatened would require the use of one. *Commonwealth v. Forts,* 2015 WL 6956784, at *4. Likewise, her decision in the second case suggests that the threat need not explicitly specify the location of the threatened action, as long as the location may be inferred from the facts surrounding the threat. *See Commonwealth v. Grenga*, 2015 WL 6956766, at *1. The orders, while they do not have precedential value, illustrate the ambiguities facing law enforcement officials in applying § 14 to specific facts, ambiguities that the *Kerns* decision did not address.

In the context of a warrantless arrest, the First Circuit has held that an officer is entitled to qualified immunity if the presence of probable cause is *at least arguable*. *Glik v. Cunniffe,* 655

F.3d 78, 88 (1st Cir. 2011) (citing *Ricci v. Urso*, 974 F.2d 5, 7 (1st Cir. 1999)) (further internal

citations omitted) (emphasis added); *see also Topp v. Wolkowski*, 994 F.2d 45, 48 (1st Cir. 1993)

(holding that an arrest challenged as unsupported by probable cause is deemed to be objectively

reasonable unless there "*clearly* was no probable cause" at the time the arrest was made.)

(emphasis in original; internal citation and quotation marks omitted).[8] That standard is met here,

and the officers are entitled to qualified immunity on the Fourth Amendment claims.

VIII.    First Amendment § 1983 Claim.

In Count I, in addition to his Fourth Amendment claims, D'Ambrosio alleges that

defendants violated his rights under the First Amendment and under Article 16 of the

Massachusetts Declaration of Rights, by arresting him (and taking further actions against him),

for making the post. (#1 at 15-17.)

The fact that the court has found that the officers had probable cause to arrest

D'Ambrosio does not necessarily settle the question whether they violated his First Amendment

rights. The First Circuit has approved jury instructions directing that an officer can be liable

under the First Amendment even where an arrest is supported by probable cause, if the jury finds

that the officer's intent to curb the expression was the determining or motivating factor behind

---

[8] The court finds that Sergeant Ewing's consultation with the prosecutor adds little to the court's calculus. As mentioned above, the First Circuit has stated that "a pre-arrest opinion from a favorable prosecutor does not automatically guarantee that qualified immunity will follow." *Cox,* 391 F.3d at 35. Here, Sergeant Ewing spoke to the ADA, whose name he no longer remembered, for "a couple of minutes." (#70-7 at 3-5.) He did not read the post to the prosecutor, but merely "summed [the post] up in roughly two or three lines." *Id.* at 7. Ewing's conversation with the ADA was not the "full presentation of the known facts" that the First Circuit has stated would enable a reasonable officer to rely on a prosecutor's advice. *Cox,* 391 F.3d at 34-35. The ADA's response--"[I]t sounds like it's the threats. If you guys see [D'Ambrosio], you should grab him"-- hardly constitutes thoughtful legal advice concerning what crime D'Ambrosio might have committed. *Id.*

the arrest. *Tatro v. Kervin*, 41 F.3d 9, 18 (1st Cir. 1994); *Freedman v. Ali*, No. 16-CV-11151-DJC, 2018 WL 5982018, at *4 (D. Mass. Nov. 14, 2018).

Here, there is no evidence that the police were motivated by a desire to squelch D'Ambrosio's writing rap lyrics. This is not a case where the police arrested someone specifically for engaging in protective speech, such as yelling at officers in a hostile manner, *see Lewis v. City of New Orleans*, 415 US. 130, 132 (1974), or for annoying or offending officers, *see Houston v. Hill*, 482 U.S. 451, 465 (1987). Rather, the officers believed D'Ambrosio had violated a threats statute, and arrested him for that. *See Nuon v. City of Lowell*, 768 F. Supp. 2d 323, 335 (D. Mass. 2011) (holding that where officer was not motivated by desire to stop plaintiff from engaging in protected speech, but in good faith wrongly believed he had probable cause to arrest plaintiff for disorderly conduct, plaintiff's motion for summary judgment on First Amendment violation denied).

One twist remains to be straightened out. Plaintiff argues that the police violated his First Amendment rights because his post was protected under the "true threats" doctrine. The First Amendment permits restrictions on speech in a few limited areas, including where the speech constitutes a "true threat." *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). *Watts* held that the First Amendment protects statements that a reasonable person would not regard as threatening. *Id.* at 706-08. The First Circuit articulates this objective standard, under which a defendant may be convicted for making a threat, as "whether he should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it [wa]s made." *United*

*States v. Clemens*, 738 F.3d 1, 10 (1st Cir. 2013) (quoting *United States v. Fulmer*, 108 F.3d 1486, 1491 (1st Cir. 1997) (internal quotation marks omitted).[9]

Massachusetts courts appear to endorse a subjective test. The SJC has said that "[t]he term 'true threat' has been adopted to help distinguish between words that literally threaten but have an expressive purpose such as political hyperbole, *and words that are intended to place the target of the threat in fear*, whether the threat is veiled or explicit." *Commonwealth v. Chou*, 741 N.E.2d 17, 23 (Mass. 2001) (communication was not protected by First Amendment because it was intended to "get back" at the victim) (emphasis added). The SJC again said, in a more recent case, that the "true threats" doctrine "applies not only to direct threats of imminent physical harm but to words or actions that — taking into account the context in which they arise — cause the victim to fear such harm now or in the future and *evince intent on the part of the speaker or actor to cause such fear.*" *O'Brien v. Borowski*, 961 N.E.2d 547, 556 (Mass. 2012) (emphasis added), *abrogated on other grounds by Seney v. Morhy*, 3 N.E.3d 577 (Mass. 2014).

If one applies the federal reasonable person standard to D'Ambrosio's post, he loses: if there was probable cause to arrest him, then ergo, he should have "reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it [wa]s made." *Clemens*, 738 F.3d at 10. The Massachusetts subjective test is a closer call. It is an open question whether, at the summary judgment stage, taking the facts in the light most favorable to him, D'Ambrosio's

---

[9] In *Clemens*, the First Circuit was invited to change its long-standing "objective defendant's vantage point test" to a subjective test, based on language in *Virginia v. Black*, 538 U.S. 343 (2003). *Clemens*, 738 F.3d at 2. Some courts, such as the Ninth Circuit, *see United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011), have held that the Supreme Court in *Black* directed that a subjective test should be used for "true threats," but the First Circuit declined to change its rule: "Absent further clarification from the Supreme Court, we see no basis to venture further and no basis to depart from our circuit law." *Id.* at 12.

protestations that he was only writing rap lyrics might create a disputed issue of fact on the point whether he intended to put anyone in fear. *O'Brien*, 961 N.E.2d at 556.

Nevertheless, the court finds that the officers here have qualified immunity. Plaintiff has pointed to no case law that demonstrates there was "controlling authority or a consensus of persuasive authority sufficient to put an officer on notice" that under the circumstances here, D'Ambrosio was entitled to protection for his speech. *Conlogue,* 906 F.3d at 155. One cannot expect arresting officers, alarmed by a perceived violation of a threats statute, acting within a very short period of time, when told by an arrestee that he was only artistically expressing himself and did not mean to threaten anyone, to first, decide whether they believe him, and then, engage in a debate concerning the interplay between federal and state intent requirements concerning the "true threats" doctrine. The law simply does not require it.

For the reasons set out above, all the claims concerning D'Ambrosio's First and Fourth Amendment rights fail, including claims involving his initial stop and frisk, claims that police wrongly accused him of violating c. 269, § 14, wrongly submitted the criminal complaint, sought an unreasonable bail, made false statements to the press, failed to conduct a proper investigation, wrongly obtained a search warrant for his home,[10] violated his privacy, and maliciously prosecuted him.[11] (#1 at 15-17.)

---

[10] Suit is allowed concerning a wrongly-issued search warrant only when "it is obvious that no reasonably competent office would have concluded that a warrant should issue." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Messerschmidt v. Millender*, 565 U.S. 535, 546-48 (2012). That standard cannot be met here.

[11] To show that the officers were liable for his continued pretrial detention, D'Ambrosio would have to show that they committed some malfeasance such as lying to prosecutors, failing to disclose exculpatory evidence, or unduly pressuring prosecutors to seek charges. *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 100 (1st Cir. 2013). D'Ambrosio argues that this requirement was met here because the officers demonstrated a "reckless disregard for the truth," as there was not probable cause to arrest him. (#83 at 2.) But the court has found that the officers did have

IX.     Conspiracy Claims.

In Count II, D'Ambrosio alleges that the officers committed common law conspiracy to violate his civil rights in violation of 42 U.S.C. § 1983, with the same wrongful actions alleged as in Count I. *Id*. at 18-20. Given the court's resolution of the § 1983 claims, the conspiracy claims fail.

X.      Claims Under the MCRA.

In Count III, D'Ambrosio alleges that the officers violated the MCRA, repeating the factual allegations from Count I. *Id*. at 20-21. In Count IV, he alleges that they committed common law conspiracy to violate his civil rights under the MCRA. *Id*. at 21-23.

The MCRA is the state analog to § 1983 and provides a cause of action for an individual whose rights under the Constitution or laws of either the United States or the Commonwealth of Massachusetts have been interfered with by "threats, intimidation or coercion." Mass. Gen. Laws c. 12, §§ 11H and 11I. The SJC has held that MCRA claims are subject to the same standard of qualified immunity for police officers that is used for claims asserted under § 1983. *Duarte v. Healy*, 537 N.E.2d 1230 (Mass. 1989); *Nuon*, 768 F. Supp. 2d at 333 (citing *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 595, 747 N.E.2d 729 (2001) (further internal citation omitted)).

The court has found that the officers have not violated D'Ambrosio's rights under the MCRA, and in any event, they are entitled to qualified immunity, so these claims fail.

---

probable cause to arrest, and plaintiff does not allege that the officers had any other improper purpose in arresting him. Further, as set out earlier, after his arrest, D'Ambrosio's dangerousness hearing under c. 279, § 58A was continued from May 2 to May 9, 2018, which means that the district court judge would have to have found that probable cause existed to arrest him. The officers cannot be blamed for his continued detention after his arrest.

XI.     <u>Remaining State Law Claims</u>.

Defendants seek summary judgment on D'Ambrosio's state law claims for false imprisonment (Count VI), false arrest (Count VII), malicious prosecution (Count VIII), and intentional infliction of emotional distress (Count IX).

Under Massachusetts law, the elements of false imprisonment are (1) intentional, and (2) unjustified, (3) confinement of a person, (4) directly or indirectly, (5) of which the person confined is conscious, or is harmed by such confinement. *Nuon*, 768 F. Supp. 2d at 336 (quoting *Noel v. Town of Plymouth, Mass.*, 895 F. Supp. 346, 354 (D. Mass. 1995) (further citations omitted)); *see also Wax v. McGrath*, 151 N.E. 317 (Mass. 1926) (unlawful restraint by force or threat constitutes false imprisonment).  A police officer is not liable for false imprisonment if he had a legal justification for the confinement. *Cabot v. Lewis*, 241 F. Supp. 3d 239, 258 (D. Mass. 2017) (citation omitted). Here, the court has found that there was probable cause to arrest D'Ambrosio, and so, this claim fails. *Id*. at 258-59. ("Because success on his false imprisonment claim would require plaintiff to show that his arrest lacked probable cause, that claim is barred.").

Under Massachusetts law, "[t]he elements of a false arrest claim are: '(1) defendant(s) intended to confine plaintiff, (2) plaintiff was conscious of the confinement, (3) plaintiff did not consent to the confinement, and (4) defendants had no privilege to cause the confinement.'" *Id.* at 259 (quoting *Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 3 n.6 (1st Cir. 1995)). Again, as the officers had probable cause to arrest, the claim fails. *Id.* ("Although probable cause is not an element of false arrest, the existence of probable cause defeats a false arrest claim.") (citations omitted).

The elements of a common-law cause of action for malicious prosecution are (1) the commencement or continuation of a criminal proceeding against the plaintiff at the behest of the eventual defendant, (2) the termination of the proceeding in favor of the accused, (3) an absence of probable cause for the charges, and (4) actual malice. *Limone v. United States*, 579 F.3d 79, 89 (1st Cir. 2009) ("To prevail on a malicious prosecution claim under Massachusetts law, a suitor must prove that the defendant (i) instituted criminal proceedings (ii) with malice and (iii) without probable cause, and (iv) that the proceedings were terminated in the accused's favor.") (citation omitted); *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001); *Freedman*, 2018 WL 5982018, at *5. This claim, too, fails, because the police had probable cause to arrest. But even if there had not been probable cause, plaintiff cannot establish that the defendants acted with actual malice. Massachusetts employs the "improper purpose" analysis set forth in § 676 of the Restatement (Second) of Torts to define the element of malice in a malicious prosecution case. *Chervin v. Travelers Ins. Co.,* 858 N.E.2d 746 (Mass. 2006). To prove an improper purpose, the plaintiff must show that defendants "acted primarily for a purpose other than that of properly carrying out [their] duties, or w[ere] attempting to achieve an unlawful end or a lawful end through unlawful means, or intended to harass, vex, or annoy the plaintiff." *Williams v. City of Boston,* 771 F. Supp. 2d 190, 206 (D. Mass. 2011); *Johnson v. Charbonnier*, No. 13-CV-13301-ADB, 2015 WL 8215892, at *6 (D. Mass. Dec. 8, 2015) (quoting *Shea v. Porter*, No. CIV.A. 08-12148-FDS, 2013 WL 1339671, at *5 (D. Mass. Mar. 29, 2013)). D'Ambrosio has offered no evidence to meet this standard.

The elements of an intentional infliction of emotional distress (IIED) claim are (1) defendants intended to inflict emotional distress or knew or reasonably should have known that emotional distress was likely to result from such conduct, (2) the conduct was extreme and

outrageous, (3) the defendants' conduct proximately caused plaintiff's emotional distress, and (4) the distress was so severe that no reasonable man could be expected to endure it. *Sindi v. El-Moslimany*, 896 F.3d 1, 21 (1st Cir. 2018); *Limone*, 579 F.3d at 91 ("Under Massachusetts law, an individual is liable for intentional infliction of emotional distress when he, by extreme and outrageous conduct and without privilege, causes severe emotional distress to another.") (internal citation and quotation marks omitted). Even assuming arguendo that there was no probable cause for D'Ambrosio's arrest, his IIED claims fail "because the facts as alleged are not sufficiently outrageous to support such a cause of action." *Godette v. Stanley*, 490 F. Supp. 2d 72, 81 (D. Mass. 2007); *Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 311 (D. Mass. 2017) ("Outrageous means a high order of reckless ruthlessness or deliberate malevolence that ... is simply intolerable. ... No extreme and outrageous conduct is adequately pleaded.") (internal citation and quotation marks omitted).

XII.    <u>Conclusion</u>.

Defendants' Motion for Summary Judgment (#65) is ALLOWED. D'Ambrosio's Motion for Partial Summary Judgment (#67) is DENIED. Judgment shall enter for the defendants.


March 31, 2019                                     /s/ M. Page Kelley
                                                  M. Page Kelley
                                                  United States Magistrate Judge